**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

TINA ROSE MNICH,

                                        Plaintiff,

            v.                                              No. 5:14-CV-740
                                                            (DNH/CFH)

CAROLYN W. COLVIN, Acting Commissioner
of Social Security Administration,

                                        Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

Olinsky Law Group                         HOWARD D. OLINSKY, ESQ.
300 S. State Street, Ste. 420
Syracuse, New York 13202
Attorneys for Plaintiff

Social Security Administration,           MONIKA K. CRAWFORD, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

        Plaintiff Tina Rose Mnich ("plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying her applications for Supplemental Security

Income benefits ("SSI") and Disability Insurance Benefits ("DIB").  Plaintiff moves for a

finding of disability, and the Commissioner cross moves for a judgment on the

pleadings.  Dkt. Nos. 10, 13.  For the following reasons, it is recommended that the

matter be remanded for proceedings in accordance with this Report-Recommendation and Order.

## I. **Background**

### A. **Procedural History**

Plaintiff, born on March 12, 1973, protectively filed a Title II application for a period of disability and DIB and a Title XVI application for SSI on May 18, 2011, alleging a disability onset date of March 2, 2011. Transcript ("T") at 190-95.[1] That application was denied on August 19, 2011. Id. at 66, 72-76. Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on October 25, 2012 before ALJ Richard E. Guida, at which vocational expert ("VE") Esperanza DiStefano testified. Id. at 10-32, 88-89. In a decision dated January 10, 2013, the ALJ held that plaintiff was not entitled to disability benefits. Id. at 13-27. Plaintiff timely filed a request for review. On February 6, 2013, the Appeals Council denied that request. Id. at 1-4. Plaintiff commenced this action on June 18, 2014. Dkt. No. 1.

### B. **Facts**[2]

#### 1. **Hearing Testimony**

Plaintiff is a high school graduate with two years of college education. T at 37,

---

[1]   Unless otherwise indicated, page citations to the administrative transcript refer to the pagination provided in the bottom right-hand corner of the administrative transcript. Page citations to pleadings and motions refer to the pagination provided by CM/ECF.

[2]   This "facts" section is a recitation of plaintiff's testimony at the hearing and in her self-reported activities of daily living and does not amount to findings of facts by this Court. See T at 34-65; 236-57.

60, 225.  Plaintiff has two children, aged nine and twelve, and lives with her children and fiancé.  Id. at 39-40.  Plaintiff's past work includes positions in child care; as a medical secretary, for four years; as a "door-to-door" sales associate; and as a gas station attendant.  Id. at 61; 225, 250.  Beginning in March 2012, plaintiff worked "under the table" as a cashier for her fiancé's "caramel corn shop."  Id. at 41.  She worked in approximately four hour shifts, two evenings per week.  Id. at 42-43.  Plaintiff would call into work three to four days out of the month.  Id. at 44.  On "a couple" of occasions, she had to leave this job early because of a headache.  Id. at 48.  In this position, she is able to alternate between sitting and standing.  Id.  After a shift of work at the caramel corn shop, she is in "constant pain," needing her fiancé to give her a massage or use a heating pad.  Id. at 52.  When asked what was "holding her back" from being able to work she replied, "[j]ust the motivation.  Usually, I'm . . . in bed all day.  I . . . am depressed a lot.  I have a hard time getting out of bed.  I have a hard time showering because of my fibromyalgia; it . . . hurts."  Id. at 40.

Plaintiff discussed that she gets Botox injections every three months to reduce her migraines.  T at 47.  With Botox, she will get seven migraines a month, rather than eighteen or nineteen per month without Botox.  Id.  Plaintiff also takes Maxalt for migraines.  Id. at 47.  When she gets a migraine, all she can do is lay down in a dark room.  Id.  Plaintiff's migraines make her to feel nauseous, last for a "couple days," and usually leave her feeling fatigued for "a couple of days" thereafter.  Id. at 48.  Plaintiff also suffers from degenerative disc disease in her cervical spine for which she receives trigger point injections and nerve blocks.  Id. at 49.  These procedures give her

3

temporary relief, lasting approximately one week.  Id.  Plaintiff experiences pain in her

neck that radiates down into her left arm.  Id. at 50.  She experiences numbness in her

fingertips and has difficulty grasping, causing her to have trouble opening jars.  Id.

Plaintiff underwent surgery on her left shoulder "because [she] had bone spurs and an

extra rib that they took out."  Id.  After surgery she "occasionally" has problems with her

shoulder insofar has she has trouble lifting over head and her shoulder "locks up on

[her]."  Id.  Plaintiff defined "occasionally" as three to four times a week "if [she is] trying

to do something."  Id.

Plaintiff also suffers from incontinence issues as a medication side effect.  T at

51.  She takes Vesicare, which "works good."  Id.  Plaintiff also suffers from

fibromyalgia, which causes her "dull, aching" pains, running "from [her] neck down to

. . . the top of [her] feet."  Id. at 52.  Plaintiff takes Lyrica, Percocet, and uses Butran

patches.  Id.  Her fibromyalgia makes it too painful for her to shower, so she must take

baths instead.  Id.  Plaintiff believes that her pain increases her depression and her

depression increases her pain.  Id.  Plaintiff goes to counseling for her Bipolar disorder

and depression.  Id. at 54.  She believes that this helps, but she still feels depressed.

Id.

At the time of the hearing, plaintiff's medications were Abilify, Prozac, and

Lamictal.  T. at 55.  Plaintiff has had one suicide attempt, but denied suicidal ideation

since that occurrence.  Id. at 55.  Plaintiff reported that, since September 27, 2011 – the

day she was released from the hospital after the suicide attempt – she "feel[s] pretty

good.  [She] see[s] [her] therapist once a week, and [she] see[s] [her] psychiatrist every

4

six weeks, and [she] stay[s] on [her] medication." Id. at 40.  Plaintiff's medications have caused side effects.  Plaintiff lost hair from Strattera and Lyrica.  T at 54.  Plaintiff feels that she has no energy, and "[i]t takes anything just to get me out of the house."  Id. Plaintiff has trouble falling asleep at night, sleeps too much during the day, and takes Ambien to help her sleep at night.  Id.  She gets four to six hours of sleep per night and five hours of sleep during the day.  Id. at 55-56.

Plaintiff testified that she as unable to perform most household chores.  T at 56. Once every three to four weeks, she will fold laundry, but cannot perform other household duties.  Id.  Plaintiff's father will take her children to their school activities.  Id. at 57.  Plaintiff's fiancé will help the children with homework and prepare meals for them.  Id.  at 41.  Plaintiff used to bowl on Saturdays and go to the casino, which she cannot do any longer.  Id. at 56.  Plaintiff talks to "a couple of friends" on the phone two or three times a week, for approximately one half of an hour at a time.  Id.

Plaintiff believes she can lift five pounds without being in pain, stand for a half of an hour, and sit for twenty or thirty minutes at one time.  Id. at 57.  When she stands for longer than a half of an hour, she feels as if her legs are giving out."  Id.  Plaintiff lies down "pretty much all day," which is "better" for her.  Id.  Plaintiff has difficulty bending and performing fine manipulations, with greater difficulty in the left hand.  Id. at 58. Plaintiff anticipated that if she had a full-time job, she would miss six to eight days per month due to her migraines, depression, and Bipolar disorder.  Id. at 58-59.

Plaintiff acknowledged a medical record from Dr. Calkins at New York Spine and Wellness (T at 487) indicating that she violated a prescription pain medication policy.  T

at 59. Plaintiff explained that the note referred to when she "went to the dentist, and

. . . had a tooth pulled, and they gave [her] Vicodin while [she] was there and [plaintiff] told [Dr. Calkins]." Id.

The ALJ presented the VE with the following hypothetical: an individual of the same, age and work experience as plaintiff, who could: perform light work, with occasional postural movements; never climb ladders or scaffolds; perform only unskilled, simple, routine work; repetitive tasks; simple work-related decisions; with few, if any, work place changes; and occasional interaction with supervisors, coworkers, and the public. T. at 61. The VE testified that someone with such limitations could no longer perform plaintiff's past work of childcare worker, door-to-door salesperson, gas attendant, or cashier. Id. at 62. The VE testified that the hypothetical claimant could perform the job of assembler or office helper. Id.

The ALJ's second hypothetical set forth the same limitations as the first, but limiting the hypothetical claimant to sedentary work. T at 63. The VE concluded that such person could perform the job of addresser, jewel stringer, or surveillance system monitor. Id. The VE testified that the "typical employer" will tolerate an employee being absent for two days per month or three if the employer is "extremely generous." Id. The VE testified that a typical employer will tolerate an employee being off task for ten percent of the time. Id. at 64. The VE testified further that a typical employer gives a ten to fifteen minute break at the beginning and ends of a shift and a half of an hour to an hour meal break in the middle of the shift. Id. at 64. The ALJ's third hypothetical kept the limitations of the first and second hypotheticals, but added the limitation of

6

exceeding the aforementioned "typical" absences and time being off task.  Id. at 64.
The VE testified that there would be no jobs that such person could perform.  Id.

### 2. **Plaintiff's Function Report**

In a June 2011 function report, plaintiff reported that she will stay in bed until her older son gets home from school at 3:08 p.m.  T at 237.   She "stay[s] up with [her] kids until [her] boyfriend[3] gets home[,] then [she] go[es] back to bed."  Id.  Plaintiff "let[s] the dog out a couple time [sic] a day if [she] get[s] up."  Id.  Plaintiff reported that her boyfriend took care of the children and the dog "as soon as he gets home."  Id.  She provided that, because of her conditions, she can no longer take care of the house, care for her children or the dog, and that she does not "like going anywhere its [sic] very hard for [her] to go to [her] appts [sic] that [she] ha[s] without medications."  Id.  Plaintiff reported that she was "usually in the same cloth [sic] for a couple days.  [She] will just change [her] cloths [sic] when [she] ha[s] an appt [sic] and put deodart [sic] on."  Id.  Plaintiff cannot take showers any longer because "it hurts [her] body to [sic] much so [she has] to take baths."  Id.  Plaintiff cannot "do" her hair because "it hurts [her] arms to [sic] much so [she] just put[s] [her] hair up in a hate [sic]."  Id.  Plaintiff further reported that she does not eat "much."  Id. at 238.  If she does, "it's a bowl of cereal."  Id.

Plaintiff reported "wetting the bed."  Id.  She reported that her boyfriend needs to remind her to bathe and he tells her "when [she is] starting to smell that [she] need[s] to

---

[3]    The person with whom plaintiff lives with is referred to as plaintiff's boyfriend and fiancé at different times throughout the record. The use herein is reflective of plaintiff's chosen designation in the particular record or testimony.

take a bath." Id. She does not need reminders to take her medications. Id. "Once in a while," she "might cook a meal for the kids," but only prepares bowls of cereal for herself. Id. Her boyfriend regularly prepares meals for her children. Id. She does not prepare meals because she "do[es] not feel like it, do[es] not have the energy." Id. Before plaintiff experienced symptoms due to her impairments, she cooked "quick" meals three to four times a week, but no longer prepares such meals. Id. at 239. Plaintiff reported that she tries to do cleaning and laundry when she is "feeling okay," but needs help with dusting, vacuuming, and cleaning the bathrooms. Id. Plaintiff's boyfriend will do laundry, and plaintiff will fold it. Id. She can no longer do yard work "since [she] got fibromyalgia [her] body hurts when [she] do[es] anything and when [she does] have energy [her] body hurts even worse the next day." Id. Plaintiff will go outside to smoke throughout the day. Id. Plaintiff reported that she will sit outside and watch her children ride their bicycles until her boyfriend gets home. Id.

Plaintiff reported that she is able to drive a car and take herself to her medical appointments, but needs to take her anxiety medication to do this. T at 239. Plaintiff will go food shopping, but waits until 11:00 p.m., "when no one is there." Id. Plaintiff reports that her hobbies and interests are watching television, which she does on a daily basis. Id. at 240. She provided that she did not always watch so much television, and used to "do[] stuff around the house." Id. at 241. Plaintiff reported that once per day, she talks to her best friend who calls her on the telephone. Id. Plaintiff provided that she had no problems getting along with friends and family. Id. She reported that she "do[es] not go anywhere, [she] used to have other friends that [she] do[es] not talk

to since [her] illness.  [She] used to go out on the weekend sometimes but [she] cann't [sic] handle the crowds."  <u>Id.</u>  Plaintiff reports losing a lot of friends because of her mood swings from her Bipolar disorder or her anxiety, which "limits what [she] can do."  <u>Id.</u> at 248.

Reporting on her physical limitations, plaintiff provided that she cannot "lift as much," cannot stand, sit, walk, climb stairs, kneel "that long without being in pain."  T at 241-42.  Plaintiff cannot squat without pain.  <u>Id.</u> at 242.  Reaching hurts plaintiff's arms. <u>Id.</u>  Plaintiff is able to use her hands without pain.  <u>Id.</u>  She reported that she "always feel[s] pressure" in her left ear.  <u>Id.</u>  She further noted that she sometimes has slurred speech and forgets what she is talking about when having conversations with others. <u>Id.</u>  Plaintiff provided that she can walk one half of a block before she "get[s] tired and start to hurt."  <u>Id.</u> at 243.  Plaintiff must rest ten to twenty minutes before she can continue walking.  <u>Id.</u>

Plaintiff reported having pain in her whole body that is "dull, stabbing, acheing [sic] stinging, shouting [sic], numbing . . . ."  T at 244.  Plaintiff's pain radiates down her left arm.  <u>Id.</u> at 245.  Plaintiff felt that her pain, which occurs on a daily basis, is getting worse.  <u>Id.</u>  Her pain lasts all day and occurs "just [from] getting out of bed."  <u>Id.</u>  Plaintiff reported taking Hydrocodone and Lyrica for her pain, and that it relieves her pain "for a little while."  <u>Id.</u>  However, she noted that she just started taking Lyrica and "d[id] not feel any difference."  <u>Id.</u>  Hydrocodone caused her to experience constipation.  <u>Id.</u> Plaintiff's other methods of pain management included physical therapy, and use of heating pads and ice packs.  <u>Id.</u> at 246.  Plaintiff's current reported daily activities are

9

"[n]othing[,] [she] either lay[s] in bed or go[es] to her dr appts [sic]." Id. She said that her conditions cause her to "only want to lay in bed and not do anything else," which makes her "feel useless that [she] cann't [sic] take care of [her] family or [her] household chores." Id.

Plaintiff reported difficulties with attention – she loses her "tran [sic] of thought real easily." T at 243. She cannot finish what she starts because she will get too tired and will need to lay down. Id. Plaintiff reported being capable of following spoken and written instructions. Id. She provided that she had no difficulty getting along with authority figures and has never lost a job due to difficulty getting along with people. Id. Plaintiff provided that stress or changes in her schedule cause her to feel anxious and she does not handle it well. Id. Plaintiff has trouble remembering things; if she does not write something down, she will forget. Id.

Plaintiff provided having fifteen headaches per month that sometimes cause "white flashing spots in [her] eyes," and "everything [to] feel louder." T at 247. Plaintiff stated that her headaches felt like throbbing and stabbing in the left side or top of her head and she reported that most of her headaches are at a level of ten on a pain scale of one to ten. Id. Plaintiff's headaches caused her to experience nausea, vomiting, and sensitivity to light and sound. Id. For her headaches, plaintiff took Treximet, as needed; Zaneflex, twice per day; magnesium oxide, twice per day; and Topamax, twice per day. Id. Plaintiff reported that Teximet works within fifteen minutes and causes no side effects, but she will sometimes need to take a second dose within two hours of the first. Id. When plaintiff feels like a headache is coming on, she does not go anywhere

or attempt household chores because she is in too much pain.  Id.

Plaintiff's anxiety began in 2004, with the condition worsening over the past two years.  T at 249.  Plaintiff's panic attacks are triggered by stressful situations, crowds, her mother, going out of the house, and "[s]ometimes nothing triggers it."  Id.  During a panic attack, plaintiff will "feel fear, rapid heartbeat, need to flee, sweating, confusion, scared."  Id.  When she feels an attack coming on, she will take her medication.  Id.  If she is in "a situation that [she] can leave[,] [she will] leave.  If not [she] tr[ies] to step back and calm [her]self down."  Id.  Plaintiff's panic attacks occur on a daily basis.  Id.  The length of the panic or anxiety attacks depends on the situation, but she experiences "[i]mmediate relief once [she] remove[s] [her]self."  Id.  Plaintiff can travel to her appointments by herself, but cannot travel long distances alone.  Id.  Plaintiff can still shop and drive, but has had panic attacks during food shopping.  Id.  Once plaintiff's anxiety or panic attacks "lessen," she "need[s] to take extra time to calm [her]self down once [she] talk [sic] [her] medication.  It all depends on the situation on how much time and why it's been so long since [she has] put [her]self in a situation where [she] would [have] an attack that is really bad."  Id.

## II. **Discussion**

### A. **Standard of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.


B. **Determination of Disability**[4]

"Every individual who is under a disability shall be entitled to a disability. . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a

_____

[4] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (SSDI), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. **ALJ Determination**

Using the five-step disability sequential evaluation, the ALJ found that plaintiff met the insured status requirements of the SSA through December 31, 2013, and that plaintiff had not engaged in substantial gainful activity ("SGA") since March 2, 2011, the alleged onset date. T at 15. At step two, the ALJ determined that plaintiff had the following severe impairments: degenerative joint disease, degenerative disc disease, fibromyalgia, migraines, Bipolar Disorder, and polysubstance dependence in remission. Id. At step three, the ALJ concluded that plaintiff did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404p. Id. at 16. Before reaching step four, the ALJ concluded that plaintiff has the residual functional capacity ("RFC") to

perform light work as defined in 20 CFR 404.1567(b) and

14

> 416.967(b) with occasional postural movements except for
> never climbing ladders, ropes, or scaffolds.  She can only
> perform unskilled work that is limited to simple, routine, and
> repetitive tasks, involving only simple, work-related decisions
> and few, if any, workplace changes.  The claimant should be
> limited to only occasional interactions with supervisors, co-
> workers, and the public.

Id.  The ALJ opined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  Id. at 19.

The ALJ determined that plaintiff is unable to perform any past relevant work.  T at 25.  The ALJ next concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[,]" which included mail clerk, assembler, and office helper.  Id.  Finally, the ALJ determined that plaintiff has not been under a disability from March 2, 2011, the alleged onset date, to the date of his decision.  Id.

### D. **Medical Opinion Evidence**

### 1. **Plaintiff's Treating Physicians**[5]

### a. **Laura Martin, DO**[6]

Plaintiff's primary care provider is Dr. Laura Martin.  Dr. Martin completed two

---

[5]  Although not a physician, the undersigned notes that plaintiff also treated with Janice Scaturo, LCSW.  However, Ms. Scaturo's treatment notes are largely illegible and, where legible, not very detailed. T at 521-43.

[6]  The ALJ refers to plaintiff's primary care provider as Laura Martin, MD.  T at 19.  Treatment records refer to her as Laura Martin, DO.  Id. at 432.

medical source statements ("MSS"), the first dated June 30, 2011 and the second, August 3, 2012.  T at 371-374; 512-14.   In the first MSS,[7] Dr. Martin reported that she has seen plaintiff on a monthly basis since 2002.  Id. at 371.  She reported that plaintiff met the American College of Rheumatology criteria for fibromyalgia.  Id.  Plaintiff experienced multiple tender points; nonrestorative sleep; chronic fatigue; morning stiffness; muscle weakness; irritable bowel syndrome; frequent, severe headaches; numbness and tingling; breathlessness; anxiety; panic attacks; depression; hypothyroidism; and chronic fatigue syndrome.  Id. at 371-72.  Dr. Martin reported that plaintiff experienced pain from fibromyalgia in her right and left: lumbroscral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands, and fingers.  Id. at 372.  Dr. Martin opined that plaintiff could walk one half of a city block without rest or severe pain.  Id.  She further provided that plaintiff could sit for thirty minutes at one time and stand for an hour at one time.  Id.  Plaintiff could sit, stand, or walk for four hours each in an eight-hour work day.  Id.  Dr. Martin reported that plaintiff would need a job that would permit her to shift her position at will, from sitting to standing or walking.  Id.  She would also need unscheduled breaks during the day, and those breaks would occur every fifteen minutes.  Id. at 373.  Dr. Martin provided that plaintiff would need to rest for five minutes before returning to work.  Id.  Dr. Martin reported that plaintiff did not need a cane or other assistive device.  Id.[8]

---

[7]  The handwritten notes accompanying Dr. Martin's June 30, 2011 MSS are partially illegible.  T. at 371-74.

[8]  In a treatment record from January 20, 2012, Holly Fink, FNP, from North Medical, P.C. observed that plaintiff used a cane to walk.  T. at 436.

16

Dr. Martin reported that plaintiff could occasionally lift up to ten pounds, and never lift above ten pounds. T at 373. Plaintiff could occasionally look down, turn her head to the left and right, and hold her head in a static position. Id. She could rarely look up. Id. Plaintiff could occasionally twist, stoop, bend, crouch, climb ladders, and climb stairs. Id. Plaintiff could frequently grasp, turn, and twist objects with her hands; use her fingers for fine manipulations; and reach overhead with her arms. Id. Dr. Martin opined that plaintiff would be off task for more than twenty percent of an eight-hour work day and would miss more than four days of work per month. Id. at 374.

In the August 2012 MSS, Dr. Martin diagnosed plaintiff with fibromyalgia, depression, and migraines, with a fair prognosis. T at 512. Dr. Martin opined that plaintiff could walk one to two city blocks without rest or severe pain, sit for a half of an hour at one time; stand for up to twenty minutes at one time; sit for at least six hours in an eight-hour work day; with normal breaks; and stand or walk for a total of two hours in an eight-hour work day, with normal breaks. Id. Dr. Martin provided that plaintiff would require a job that permits shifting positions at will from sitting, standing, or walking, and would need to take unscheduled breaks during an eight-hour work day on an hourly basis. Id. These breaks would need to last five to ten minutes. Id. Dr. Martin provided that plaintiff did not need a cane or assistive device. Id. at 513. Dr. Martin concluded that plaintiff could frequently lift less than ten pounds, occasionally lift ten pounds, and never lift greater than ten pounds. Id. Plaintiff could occasionally look down or up, and frequently turn her head left or right or hold it in a static position. Id. Plaintiff could occasionally twist and climb stairs and rarely stoop, bend, crouch, squat, and climb

ladders.  Id.  Plaintiff could frequently complete fine manipulation of her fingers and occasionally grasp, turn, and twist objects with her hands and reach.  Id.  Dr. Martin opined that plaintiff would be off task for twenty percent of the day in an eight-hour work day.  Id.  Plaintiff's impairments would likely cause good and bad days.  Id. at 514. Plaintiff is likely to be absent more than four days per month.  Id.  Dr. Martin listed as "additional limitations": "Bipolar, Depression, Hx of suicide attempts 10/11 (upstate)[,] migraines[,] fibromyalgia since 2002."  Id.

### b. **Dr. Miranda Mohabir**

Dr. Miranda Mohabir completed an MSS on June 30, 2011 and on August 13, 2012.  T. at 365-70; 515-17.  In the first MSS, Dr. Mohabir noted that plaintiff has been "unsuccessfully" treated for Bipolar Depression.  Id. at 369.  She provided that plaintiff was cooperative and neatly dressed, her mood was depressed, and her affect was constricted.  Id.  at 368.  Plaintiff was goal-directed and her speech had a regular rate, rhythm, and volume.  Id.  Plaintiff's insight and judgment were fair; she was oriented by three; her memory was fair, she recalled three items in three minutes; her information was "good"; and her ability to perform calculations was poor, she "could not do serial 7's [sic] beyond 93."  Id.

Dr. Mohabir reported that, as of June 2011, plaintiff is "still adjusting and adding meds" and did not respond to Litium, Depakote, and Abilify "due to ineffectiveness or adverse effects."  T at 369.  Plaintiff's "current symptoms" were: "sad, crying, poor

energy, poor motivation, feelings of helplessness, hopelessness, S.I.[9] Alternating with

Hypomanic sympts [sic]: high energy, racing thoughts, impulsivity." Id. at 370.

Plaintiff's history of medication included lithium, which gave her a rash and was

ineffective; Depakote, which caused her to lose her hair; and Abilify, which had no

effect. Id. Plaintiff was then taking Geodon, Prozac, Klonopin, and Lunesta. Id.

Plaintiff's prognosis was "[l]ifetime illness with remission & relapse expected." Id. Dr.

Mohabir provided that plaintiff had no limitations in understanding and memory,

sustained concentration and persistence, social interaction, or adaption. Id. Dr.

Mohabir listed plaintiff's fibromyalgia as another condition that was significant to

recovery. Id. at 366.

Plaintiff's reported activities of daily living were "tak[ing] care of home & kids w/

difficulties." T at 367. In response to a question asking about plaintiff's ability to

function in a work setting, Dr. Mohabir concluded that plaintiff was "unable to do so at

this time." Id. Dr. Mohabir reported that plaintiff demonstrates suicidal features, in that

she has "on/off passive S.I." Id. Ultimately, Dr. Mohabir concluded that her medical

opinion was that plaintiff was "unable to work at this time." Id.

In the August 2012 MSS, Dr. Mohabir reported that she treated plaintiff once

every one to two months for twenty minutes, beginning on March, 22, 2011. T at 515.

Dr. Mohabir diagnosed plaintiff with Bipolar II, GAD, fibromyalgia, chronic pain,

migraine, degenerative disc disease, with a poor prognosis. Id. Dr. Mohabir observed

---

[9]     It appears to the undersigned that "S.I." stands for suicidal ideation.  T at 367 (using abbreviation S.I. after indicating that plaintiff had suicidal features).

that plaintiff experienced anhedonia, pervasive loss of interest in almost all activities;

appetite disturbance with weight change, decreased energy; a history of suicidal

thoughts/thoughts of harming others; blunt, flat, or inappropriate affect; feelings of guilt

or worthlessness; generalized persistent anxiety; somatization unexplained by organic

disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation;

emotional withdrawal or isolation; impulsive and damaging behavior; impairment in

impulse control; manic syndrome; persistent disturbances of mood or affect; easy

distractibility; memory impairment – short, intermediate, or long term; sleep disturbance,

decreased need for sleep; autonomic hyperactivity.  Id.

Addressing plaintiff's ability to perform work activities, Dr. Mohabir concluded

that plaintiff was (1) not limited in: her ability to understand, remember, and carry out

very short and simple instructions and ask simple questions or request assistance; work

appropriately with the general public; maintain socially-appropriate behavior; adhere to

basic standards of neatness and cleanliness; and using public transportation; (2) limited

but satisfactory in: making simple work-related decisions and being aware of normal

hazards and having the ability to take appropriate precautions; and traveling to an

unfamiliar place; (3) seriously limited but not precluded in: remembering work-like

procedures; sustaining an ordinary routine without special supervision; accepting

instructions and responding appropriately to criticism from supervisors; getting along

with co-workers and peers without unduly distracting them or exhibiting behavior

extremes; and responding appropriately to changes in a routine work setting; and (4)

unable to meet competitive standards in: maintaining attention for a two-hour segment;

maintaining regular attendance and punctuality; working in coordination with or proximity to others and not being unduly distracted; completing a normal work day and work week without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; and dealing with normal work stress. T at 516-17.

Dr. Mohabir noted that plaintiff's psychiatric condition exacerbated her experience of pain and other physical symptoms. T at 517. Dr. Mohabir concluded that plaintiff was likely to be off task for more than twenty percent of an eight-hour work day and be absent more than four days per month. Id.

### c. **Dr. Hassan Shukri**

Dr. Hassan Shukri, of CNY Neurological Consulting, completed an MSS on August 14, 2012. T. at 518-20. Dr. Shukri listed plaintiff's diagnoses as chronic migraine headaches and cervicalgia, with a poor prognosis. Id. at 516. Dr. Shukri opined that plaintiff could walk one city block without rest or severe pain. Id. She could sit for twenty minutes at one time and stand for thirty minutes at one time. Id. Further, plaintiff could sit/stand/walk for less than two hours in an eight-hour work day. Id. Plaintiff would require a job that permitted frequent shifting from sitting, standing, or walking, at will, and would need to take unscheduled breaks during an eight-hour work day on a daily basis. Id. These breaks would need to last one to two hours before she could return to work. Id. Dr. Shukri stated that plaintiff would need a cane or assistive

device to walk/stand.  Id. at 519.  He opined that plaintiff could lift under ten pounds frequently but could never lift over ten pounds.  Id.  Further, Dr. Shukri provided that plaintiff could rarely hold her head in a static position and could occasionally look down, up, and turn her head from left to right.  Id.  Plaintiff could occasionally climb stairs; rarely climb ladders; and never twist, stoop, bend, crouch, and squat.  Id.  Plaintiff could rarely reach her arms, and occasionally grasp, turn, and twist objects with her hands and use her fingers for fine manipulations.  Id.  Plaintiff's impairments would likely produce good and bad days and she would likely be off task more than twenty percent of an eight-hour work day and absent more than four days per month.  Id. at 520.

In a neurological consultation from November 2010, Dr. Shukri observed that plaintiff's recent and remote memory were in tact and there was no difficulty with complex instruction.  T. at 563.  Plaintiff was oriented times three, attentive, and able to give a well-organized medical history.  Id.  Plaintiff's "[m]otor and tone [were] normal in all four extremities . . .  The muscles ha[d] good consistency in all four limbs, and there [was] no focal or generalized atrophy or fasciculation.  Strength [was] normal in all four limbs."  Id.  Plaintiff's muscle stretch reflexes in her upper extremities, biceps, triceps, and brachioradialis were "symmetrical at +2."  Id.  Plaintiff's knee and ankle jerks were "symmetrical at +2."  Id.  "Both plantor responses [were] flexor."  Id.  Plaintiff had normal gait, and had no difficulty with toe, heel or tandem walking.  Id.  Plaintiff's cervical range of motion was limited to the left more than to the right, and Dr. Shukri noted "some tenderness in the upper cervical area and occipital notch."  Id.  Dr. Shukri's assessment was that plaintiff had "a history of migraine headaches, cervicogenic headache and

maybe analgesic overuse headache." Id. at 564.

During a September 13, 2011 visit, Dr. Shukri noted that plaintiff's "headache has been under better control, she is using Treximet." T at 566. Plaintiff reported that "she has been noticing lately she is more forgetful, she had been slowing down and sleeping most of the time." Id. Dr. Shurki noted that plaintiff had a "masked face, she has decreased blinking." Id. Plaintiff's gait was slow and she had decreased arm swing. Id. Dr. Shukri treated plaintiff with Botox injections to help with headaches. Id. at 568-70. After the first treatment, Dr. Shukri noted that plaintiff "did extremely well for 2 months. She is almost headache free. By the end of 4 months she started having recurrence of her headache." Id. at 569. At an August 2, 2012 visit, Dr. Shukri noted that plaintiff was doing "fairly well except by the end of the Botox she will have recurrence of her headache." Id. at 570. Dr. Shukri noted that plaintiff takes up to nine Imitrex per month. Id.

### d. **Dr. Anne Calkins**

Dr. Anne Calkins, from New York Spine and Wellness, completed an MSS on June 23, 2011 and another on August 21, 2012. T at 375-77; 521-23. In the first MSS, Dr. Calkins reported that plaintiff had all eighteen fibromyalgia tender points. Id. at 375. Plaintiff experienced multiple tender points; nonrestorative sleep; chronic fatigue; morning stiffness; muscle weakness; frequent, severe headaches; numbness and tingling; anxiety; and depression. Id. Plaintiff suffered bilateral pain on a daily basis that ranged from six to eight on a pain scale of one to ten in her: lumbrosacral spine,

cervical spine, thoracic spine, chest, shoulders, arms, hands, fingers, hips, legs, knees, ankles, and feet.  Id. at 376.  Changing weather, stress, fatigue, hormonal changes, movement/overuse, and cold all precipitated pain.  Id.  Dr. Calkins provided that plaintiff could walk one or two city blocks without rest or severe pain, sit for fifteen minutes at one time, and stand for ten minutes at one time.  Id.  Plaintiff could stand or walk for less than two hours total and sit for about four hours total in an eight-hour work day.  Id.  Plaintiff would require a job that permits her to shift positions at will from sitting, standing, and walking.  Id.  Dr. Calkins proposed that plaintiff would be off task more than twenty percent of an eight-hour work day, and would be absent more than four days per month.  Id. at 377.  Plaintiff's impairments would cause her to experience good and bad days.  Id.  Further, Dr. Martin indicated that plaintiff's "medications in total affect [her] cognitive ability."  Id.

In the August 2012 MSS, Dr. Calkins reported that she had been treating plaintiff once every three months for a half of an hour per visit.  T at 521-23.  Dr. Calkins listed plaintiff's diagnoses as intractable headaches, cervicalgia, and fibromyalgia, with a fair prognosis.[10]  Id.  Dr. Calkins provided that plaintiff could walk one city block without rest or severe pain, sit for twenty minutes, and stand for thirty minutes at one time.  Id.  Plaintiff could sit, stand, and walk for less than two hours total in an eight-hour work day.  Id.  Plaintiff would need a job where she could shift her position at will from sitting, standing, or walking.  Id.  Dr. Calkins opined that plaintiff would need to take six unscheduled breaks lasting thirty minutes each in an eight-hour work day.  Id.  Dr.

---

[10]  Dr. Calkins listed one other impairment, but it is not legible.  T at 520.

24

Calkins provided that plaintiff would need to stand or walk with an assistive device.  Id.

at 522.  Plaintiff could carry less than ten pounds rarely and never carry greater than

ten pounds.  Id.  Plaintiff could rarely climb stairs, but could never twist, stoop, bend,

crouch, squat, or climb ladders.  Id.  Plaintiff could never reach with her arms, but could

rarely grasp, turn, and twist objects with her hands and perform fine manipulations with

her fingers.  Id.  Plaintiff's impairments would likely produce good and bad days.  Id.  Dr.

Calkins concluded that plaintiff would likely be off task for greater than twenty percent of

the day in an eight-hour work day and be absent more than four days per month.  Id. at

522-23.

### e. **Dr. Kevin Settler**

Dr. Martin referred plaintiff to Kevin J. Setter, M.D., an orthopedic specialist, in

January 2011.  T at 524-37.  Dr. Setter performed a series of cortisone injections in

plaintiff's left shoulder and referred her to physical therapy.  See id.  On March 14,

2012, after plaintiff "failed conservative care," Dr. Setter performed left shoulder

arthroscopy, decompression, and debridement surgery on plaintiff after an MRI was

"indicative of a partial-thickness rotator cuff tear."  Id. at 524-25, 528, 536.  Following

surgery, plaintiff attended physical therapy, which was "helping her motion and her

pain."  Id. at  526-27.  On March 27, 2012, plaintiff had "[a]ctive forward elevation to

about 135, passively at 165, pain at the end range there.  Sensation is grossly in tact."

Id. at 527.

### f. **Dr. Mohammad Iqbal, MD, MPH, MSPH**

Plaintiff began treating with Dr. Iqbal in March 2010 and ended treatment, switching to a different provider, in June 2011.[11] T at 544. At an April 13, 2010 examination, Dr. Iqbal listed plaintiff's impairments as Bipolar Disorder II, migraine, and neck pain. Id. at 546. Dr. Iqbal observed that plaintiff as well groomed, neat and clean, and cooperative; her speech was normal, coherent, and organized; her mood was unhappy; her affect was sad/down; her thoughts were logical, goal directed, coherent, and concrete; she had normal perceptions; she was oriented x3; she could recall objects immediately and after three minutes; she had excellent insight; and she had OK judgment. Id. at 547.[12] On July 11, 2010, plaintiff reported "at least 100% improvement in her overall symptoms. Id. at 549.

Dr. Iqbal completed an MSS on March 1, 2011. T at 559-561. Dr. Iqbal noted that he saw plaintiff every three to four weeks "for medication management." Id. at 559. Dr. Iqbal listed plaintiff's diagnoses as Bipolar Disorder, migraine/neck pain, with a prognosis of "poor - if not treated." Id. Dr. Iqbal noted that his identification of plaintiff's signs and symptoms were based on her condition as of March 2011. Id. Dr. Iqbal observed the following symptoms: anhedonia, decreased energy, mood disturbance, emotional withdrawal or isolation, emotional [illegible], persistent disturbances of mood or affect, sleep disturbance, and decreased need for sleep. Id. Dr. Iqbal assessed

---

[11] Portions of Dr. Iqbal's records are either difficult to read or illegible. See T at 559-561.

[12] A "mental status examination" is included with medical records for each of plaintiff's visits with Dr. Iqbal. T at 559-561. These observations are largely identical for each visit. See id.

plaintiff as (1) unlimited/very good in her ability to: understand, remember, and carry out very short and simple instructions; (2) limited but satisfactory in her ability to: maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; and (3) seriously limited, but not precluded in her ability to: remember work-like procedures; work in coordination with or proximity to others without being unduly distracted; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  Id. at 560.  Dr. Iqbal indicated that plaintiff "can't handle stress at work."  Id. at 561.  Further, plaintiff was limited but satisfactory in her ability to interact appropriately with the general public, maintain socially-appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel to unfamiliar places.  Id.  Dr. Iqbal provided that plaintiff had a psychiatric condition that exacerbated her feelings of pain.  Id.  Dr. Iqbal opined that plaintiff would be off task for more than fifty percent of an eight-hour work day and would miss more than four days of work per month.  Id.

### g.  Hospital and Physical Therapy Records

Plaintiff was admitted to Upstate University Hospital on September 20, 2011

after she "overdosed on Klonopin and Hydrocodone subsequent to becoming depressed after losing her disability income." T at 422. Plaintiff's Global Assessment Functioning ("GAF")[13] score on admission was 35. Id. Plaintiff was discharged on September 27, 2011, noting that she "felt 100% better than when she first came in." Id. Medical records indicate that plaintiff's mother indicated that, on the day of discharge, plaintiff "was herself again" and that plaintiff's fiancé and friends who had spoken with plaintiff the weekend before her discharge "were all in agreement that [plaintiff] had recovered and was ready to be discharged to go home." Id. At discharge, plaintiff's GAF was 60. Id.

Plaintiff attended physical therapy from May to August 2011. T at 350-51; 417-418. She also attended physical therapy before and after her shoulder surgery. Id. at 350-52; 524-33. Plaintiff reported no change during physical therapy throughout all of May 2011. Id. at 350-51. Plaintiff reported no change or additional discomfort throughout most of her therapy sessions in July 2011. Id. at 417. However, on July 27, 2011, plaintiff reported a pain level of six out of ten before starting her therapy session and a one out of ten at the end of the session. Id. at 417-18. On August 9, 2011, plaintiff received an S-3 vest and was to perform home therapy exercises wearing the vest. Id. at 418. Plaintiff reported that the vest was "helping" but she felt some

---

[13] The GAF Scale "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Pollard v. Halter, 377 F.3d 183, 186 (2d Cir. 2004). GAF is measured on a 100-point scale, and a GAF score 31-40 indicates an individual has "[s]ome impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood," a score of 41-50 indicates "serious symptoms," a score of 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM–IV–TR at 32-34.

numbness in her fingers that only occurred while wearing the vest.  Id.  On August 12, 2011, plaintiff reported a range of pain from zero to four out of ten, but that "overall her pain has decreased."  Id.  On August 24, 2011, plaintiff reported to her therapist an increase in her fibromyalgia symptoms.  Id.

### h. **Imaging Studies and Tests**

On August 26, 2009, following complaints of neck and left arm pain, plaintiff underwent EMG and a nerve conduction study.  Id. at 307.  Dr. Rina Davis reported that the study was normal and there was "[n]o evidence of peripheral neuropathy, cervical radiculopathy or peripheral nerve entrapment.  There is mild delay in onset latency of the ulnar sensory nerve, however, there is no other evidence that this is an entrapment."  Id.  Plaintiff had EMG and a nerve conduction study performed on November 23, 2010 after she had complaints of neck pain with radiating pain into the left arm and forearm, and "associated numbness and tingling in this distribution as well."  Id. at 322.  All nerve conduction studies were within normal limits, all "F Wave latencies" were within normal limits, and all examined muscles showed no evidence of electrical instability.  Id.  The examiner, Raymond Alcuri, MD, provided that "[m]onopolar needle EMG studies of the left upper extremity reveal no electrodiagnostic evidence of an acute or chronic cervical radiculopathy.  Nerve condition studies of the bilateral upper extremities reveal no electrodiagnostic evidence of a mononeuropathy or peripheral neuropathy."  Id.  A July 26, 2011 X-ray of plaintiff's cervical spine showed facet joint arthropathy and degenerative changes.  T at 387.  A January 20, 2012 X-ray

of plaintiff's spine and sacrum showed mild symmetric bilateral SI joint and

degenerative joint disease.  Id. at 434-35.

## 2. **Consultative Examiners**

### a. **Kalyani Ganesh, M.D.**

Dr. Ganesh performed a consultative internal medicine assessment of plaintiff on

July 26, 2011.  T at 383-87. Plaintiff reported to Dr. Ganesh that she quit her job as a

medical assistant after her doctor "pulled her out of work" because "she couldn't stop

crying."  Id. at 383.  Plaintiff reported taking Prozac, Geodon, Klonopin, Hydrocodone,

Lyrica, Treximet, Zanaflex, and Topamax.  Id. at 384.  Plaintiff reported living with her

fiancé and her two children.  Id.  Plaintiff provided that her fiancé does all of the chores

and childcare, and that he works.  Id.  Plaintiff bathes and gets dressed once per week.

Id.  Plaintiff's reported activities are watching television, listening to the radio, and

reading.  Id.  Dr. Ganesh observed that plaintiff appeared to be in no acute distress.  Id.

Plaintiff's gait was normal and she could walk on her heels and toes without difficulty.

Id.  Plaintiff was able to squat full, her stance was normal, and she did not use an

assistive device.  Id.  Plaintiff was able to rise from her chair without difficulty and did

not need assistance with changing or getting on and off of the exam table.  Id.

Dr. Ganesh noted that plaintiff's

> [c]ervical spine shows full flexion, extension, lateral flexion
> bilaterally, and full rotary movement bilaterally.  No scoliosis,
> kyphosis, or abnormality in thoracic spine.  Lumbar spine
> flexion 75 degrees.  Cannot do extension.  Lateral flexion
> and rotation 10 degrees. SLR negative bilaterally.  Full ROM
> of shoulders, elbows, forearms, and wrists bilaterally.  Joints

> stable and nontender.  No redness, heat, swelling, or
> effusion.  She has 16 tender points and seven control points:
> Bilateral occiput, trapezius, supraspinatus, gluteus, greater
> trochanter, second rib, lateral epicondyle, and knees.  Seven
> control points: One mid forehead, two mid forearm, two mid
> thighs, and two base of scapula.

Id. at 385.  In performing a neurologic assessment, Dr. Ganesh noted: "DTRs physiologic and equal in upper and lower extremities.  No sensory deficit noted.  Strength 5/5 in upper and lower extremities."  Id. at 386.  Dr. Ganesh observed no cyanosis, clubbing, or edema of plaintiff's extremities; pulses physiologic and equal.  No significant varicosities or trophic charges.  No muscle atrophy evident."  Plaintiff's hand and finger dexterity were noted as intact, with five out of five grip strength, bilaterally.  Id.  Dr. Ganesh observed plaintiff's "overall movements appear to be quite brisk," and noted no difficulties at any time, "no gross limitations as to sitting, standing, walking and the use of upper extremities."  Id.  He noted mild limitation in lifting, carrying, pushing, and pulling.  Id.  Dr. Ganesh listed plaintiff's diagnoses as cervical disc disease, impingement syndrome, left rotator cuff, fibromyalgia, migraine, and bipolar disorder.  Id.  Dr. Ganesh's prognosis was stable.  Id.

b. **Dennis M. Noia, Ph.D.**

Dr. Noia performed a psychiatric examination of plaintiff on July 26, 2011.  T. at 378-82.  Plaintiff reported waking up three times per night and that she had a decreased appetite.  Id. at 378.  Plaintiff reported "symptoms of depression, including dysphoric moods, psychomotor retardation, crying spells, feelings of guilt, hopelessness, loss of usual interests, increased irritability, fatigue and loss of energy,

31

low self esteem, problems with memory, problems with concentration, and diminished sense of pleasure." Id. at 379. Plaintiff reported a history of alcohol, LSD, and cocaine use from 1993 to 1998, but that she "stopped on her own, and has not used since." Id.

Dr. Noia noted plaintiff was cooperative and responsive during the examination, and that her "manner of relating, social skills, and overall presentation was adequate." T at 380. Plaintiff had good hygiene and grooming, normal gait and posture, normal motor behavior, and normal eye contact. Id. Plaintiff's thought processes were "coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking." Id. Plaintiff's mood was depressed, and Dr. Noia noted that plaintiff "appeared sad." Id. Plaintiff was oriented times three. Id. Her attention and concentration were intact; she did counting, simple calculations, and serial threes. Id. Dr. Noia reported plaintiff's recent and remote memory skills to be mildly impaired, and that plaintiff could recall three objects immediately, two after five minutes, and restate four digits forward and two backward. Id. Dr. Noia estimated plaintiff's intellectual functioning to be low-average. Id. Her insight and judgment were fair. Id.

Plaintiff reported to Dr. Noia that she was not "usually" able to handle cooking, cleaning, driving, chores, shopping, managing money, or taking public transportation. T at 380. Plaintiff reported that "sometimes" she was able to dress, bathe, and groom herself. Id. Plaintiff got along with friends and family. Id. Plaintiff spent her time resting and watching television. Id. Dr. Noia concluded that plaintiff appears capable of: "understanding and following simple instructions and directions"; "performing simple and some complex tasks with supervision and independently"; "maintaining attention

32

and concentration for tasks"; "regularly attend to a routine and maintain a schedule"; "learning new tasks"; "making appropriate decisions"; and relating to and interacting "moderately well with others." Id. at 381. He observed that plaintiff "appears to be having some difficulty dealing with stress." Id. Dr. Noia noted that the examination results were consistent with plaintiff's allegations. Id. Dr. Noia's prognosis for plaintiff was "guarded, but it is hoped that with continued intervention and support, she will find symptom relief and maximize her abilities." Id.

### 3. **Non-examining Agency providers**

#### a. **N. Bahl**

N. Bahl completed a physical RFC on August 17, 2011. T. at 343-49. Bahl reviewed a August 26, 2009 EMG; an October 2010 MRA of the brain; Dr. Shukri's exam of March 8, 2011; Dr. Calkins' exams from March 5, 2011 and May 3, 2011; a CE Internal Medicine exam from July 26, 2011. Id. at 344-45. Bahl concluded that plaintiff's medical records established that she could lift twenty pounds occasionally, ten pounds frequently; sit for about six hours in an eight-hour work day; stand or walk for a total of about six hours in an eight-hour work day; and that plaintiff had no limitations on pushing or pulling. Id. at 344. Bahl noted no postural, manipulative, visual, or communicative limitations. Id. at 345-46. Bahl noted that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation, due to plaintiff's history of migraines, but noted no other environmental limitations. Id. at 346. Bahl concluded that plaintiff's statements regarding her activities of daily living "are

credible, however not to the extent alleged," noting that she reported that her fiancé does all of the chores, but that she told a social worker in April 2011 that she was able to care for a hospitalized mother and son, as well as a recovering father.  Id. at 347.  Bahl noted that Dr. Martin reported that plaintiff was unable to perform sedentary work, but pointed out that Dr. Ganesh concluded that plaintiff could perform light to medium work, and concluded that Dr. Ganesh's "opinion is consistent w/ evidence in record & therefore adopted."  Id.  at 347-48.

### b. **G. Kleinerman, Psychiatry**

G. Kleinerman completed a psychiatric RFC on August 2, 2011.  T at 388-405.  Kleinerman concluded that plaintiff was moderately limited in her abilities to: work in coordination with or proximity to others without being distracted by them; complete a normal work day or work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavior extremes; respond appropriately to changes in the work setting; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  Id. at 403.  Kleinerman found mild restrictions in plaintiff's activities of daily living and in her ability to maintain concentration, persistence or pace, and moderate difficulties in maintaining social functioning.  Id. at 398.  He further concluded that there was insufficient evidence of episodes of decompensation and that

the evidence did not establish the presence of "paragraph C" criteria.  <u>Id.</u> at 398-99.

### E.  **Analysis**

Plaintiff first argues that the ALJ's RFC assessment is unsupported by

substantial evidence because the ALJ erroneously afforded little weight to the opinions

of her treating physicians, Drs. Martin, Calkins, Shukri, Mohabir, and Iqbal.  Dkt. No. 10

at 12.  Plaintiff further argues that the ALJ's credibility determination is also

unsupported by substantial evidence because the ALJ erroneously found plaintiff less

credible due to her return to part-time work and a misinterpretation of a doctor's report

alleging drug-seeking behavior.  <u>Id.</u> at 22.  Finally, plaintiff contends that the ALJ's step

five findings are not supported by substantial evidence because "it was based upon an

incomplete hypothetical question."  <u>Id.</u> at 26.

### 1.  **Weight Given to Treating Physicians**

A treating physician's opinion on the nature and severity of a plaintiff's

impairments will be given controlling weight when it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence."  20 C.F.R. § 404.1527(c)(2); <u>Halloran v. Barnhart</u>, 362 F.3d

28, 32 (2d Cir. 2004).  "Although the treating physician rule need not be applied if the

treating physician's opinion is inconsistent with opinions of other medical records, 'not

all expert opinions rise to the level of evidence that is sufficiently substantial to

undermine the opinion of the treating physician.'"  <u>Flagg v. Astrue</u>, No. 11-CV-458

(LEK), 2012 WL 3886202, at *10 (N.D.N.Y. Sept. 6, 2012) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)).  If substantial evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and "the less consistent the opinion is with the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (citation omitted).  Moreover, as the ultimate conclusion whether a plaintiff is disabled and cannot work is reserved to the Commissioner (20 § C.F.R. 404.1527(e)(1)), "[a] treating physician's statement that the claimant is disabled cannot itself be determinative."  Snell, 177 F.3d at 133.

Should the ALJ decline to give controlling weight to a treating physician, he or she "must still consider various 'factors' in deciding how much weight to give the opinion."  Petrie v. Astrue, 412 F. App'x 401, 405 (2d. Cir. 2011).  The ALJ considers: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship;[14] (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see 20 C.F.R. § 404.1527(c)(2).  This is necessary to assist the court's review of the Commissioner's decision and it "let[s] claimants understand the disposition of their cases."  Halloran, 362 F.3d at 33 (citing Snell, 177 F.3d at 134).  When an ALJ rejects the treating physician's opinions or otherwise determines that they are not controlling, the ALJ must

_____

[14]  In general, the longer a treating physician has treated the claimant and the more times the claimant has been seen by the treating provider, the more weight the Commissioner will give to the physician's medical opinions.  See Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2)(I)).

set forth his or her reasoning with specificity. 20 C.F.R. §§ 404.1527(c)(2); see, e.g., Doyle v. Apfel, 105 F. Supp. 2d 115, 119 (E.D.N.Y. 2000). An ALJ's "[f]ailure to provide [explicit] good reasons for not crediting a treating source's opinion is ground for remand." McClaney v. Astrue, No. 10-CV-5421 (JG/JO), 2012 WL 3777413, at *16 (quoting Snell, 177 F.3d at 134). However, "where the evidence of record permits [the court] to glean the rationale of an ALJs decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." Petrie, 412 F. App'x at 407.

In addition, a consultative physician's opinions should generally be given "little weight." Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of [the] claimant's medical history, and, at best, only give a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (internal quotation and citation omitted). However, a consultative examiner's opinion can be considered substantial evidence where it is well supported by medical evidence in the record. Petrie, 412 F. App'x at 405; Monguer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983); see also Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011) (citations omitted). Ultimately, the final determination of disability and a claimant's ability to work rests with the Commissioner. Snell, 177 F.3d at 133-34 (citing 20 C.F.R. § 404.1527(e) (1)).

The undersigned will address each of plaintiff's treating physicians in turn.[15]

a. **Dr. Calkins**

The ALJ afforded Dr. Calkin's opinion little weight, concluding that the MSS, which contained limitations that would prevent work, "were inconsistent with the imaging and testing." T at 24. The ALJ further concluded that "objective examinations by Dr. Calkins show mostly normal musculoskeletal findings, including normal grip strength, upper extremity range of motion, and normal gait." Id. "For example," the ALJ pointed to a March 12, 2012 visit wherein Dr. Calkins "only noted tenderness on palpitation while also noting normal gait, full range of motion for head and neck, and normal extremities." Id. Elsewhere in his decision, the ALJ noted that, despite plaintiff's reports of increasing shoulder pain and fibromyalgia pain, Dr. Calkins observed that plaintiff had good motor tone and strength in her extremities and normal gait. T at 20, citing T at 332-35.[16] Similarly, the ALJ acknowledged that plaintiff reported little improvement with physical therapy initially, then a decease in her pain by August 2011

---

[15] The ALJ did not hold, nor does the Commissioner dispute, that Drs. Shukri, Mohabir, Iqbal, Martins, or Calkins were not treating physicians.

[16] For the sake of a clear record, the undersigned observes that the ALJ cites to a treatment noted dated March 12, 2012, indicating that Dr. Calkins found plaintiff to have "full strength, range of motion, and normal grip strength in both extremities *after surgery*." T at 24. However, the exam the ALJ cites occurred two days *before* plaintiff had shoulder surgery. Id. at 480. Furthermore, although the ALJ observed that Dr. Calkins' March 12 exam revealed full range of motion, the range of motion referred to in his exam was in plaintiff's neck, not in the left shoulder in which she had surgery. Id. at 489-91. The actual post-surgery visits with Dr. Calkins on May 10, 2010 and July 9, 2012 revealed pain levels of six and eight out of ten, "constant" pain in the posterior neck and left shoulder and pain that "radiates to the left shoulder, left arm, left hand" and all left digits. Id. at 482, 485. Dr. Calkins opined that plaintiff's functional status was limited in her ability to work, perform house work, activities of daily living. Id. at 485. On both of these visits, plaintiff's gait was normal, and she was able to get on and off the exam table without assistance. Id. at 483, 487.

38

after making use of an S-3 vest and exercise, but worsening fibromyalgia pain in late 2011, despite medication, physical therapy, and use of a TENS unit.  Id. at 20.  The ALJ also refers to a March 12, 2012 treatment note from Dr. Calkins, who observed that plaintiff "showed full strength, range of motion, and normal grip strength in both upper extremities after the surgery."  Id. at 20.[17]  The ALJ also referred to a May 2012 treatment note wherein plaintiff reported exacerbation of her neck pain radiating into her upper extremities.  Id. The ALJ reviewed a May 2010 visit wherein plaintiff reported exacerbation of her neck pain, radiating into her upper extremities, but observed that, "[d]espite these reports, [Dr. Calkins] indicated that [plaintiff] was able to get on and off the examination [table] without assistance (tacitly suggesting that she has no difficulty with upper extremity usage)."  Id. at 20-21.

Dr. Calkins is a treating physician, as she provided plaintiff with pain management treatment since July 20,2009, and met with plaintiff on approximately twenty-two occasions.  See Dkt. No. 10 at 17 n.6; see generally Jonas v. Apfel, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (noting that a treating physician is the claimant's "own physician, osteopath, or psychologist . . . who has provided the individual with medical treatment or evaluation, and who has an ongoing treatment and physician-patient relationship with the individual.") (citation omitted).  Thus, the ALJ was required to afford significant weight to her opinion unless he found that her opinion was contradicted by substantial evidence in the record or unsupported by objective findings. Although the ALJ contends that Dr. Calkins' limitations were inconsistent with imaging,

---

[17]  See n.16, supra at 38.

testing, and her own examinations which revealed normal musculoskeletal findings, grip strength, range of motion, and gait (T at 24), the undersigned observes that Dr. Calkins was treating plaintiff for fibromyalgia, a condition that does not necessarily lend itself to diagnostic testing.

Fibromyalgia is defined by the Commissioner as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least three months."  SSR 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 2012 WL 3104869, at *3 (S.S.A. July 25, 2012).  Indeed, this Court has recognized that fibromyalgia is a

> medical abnormality consisting of a syndrome of chronic pain of musculoskeletal origin but uncertain cause.  Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have normal physical examinations, e.g., full range of motion, no joint swelling, normal muscle strength and normal neurological reactions.  Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to confirm its diagnosis.

Campbell v. Colvin, No. 5:13-CV-451 (GLS/ESH), 2015 WL 73763, at *5 (N.D.N.Y. Jan. 6, 2015).   "Nevertheless, a 'mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability."  Clasen v. Colvin, 3:13-CV-1390 (GLS/ESH), 2015 WL 1312548, at *3 (Mar. 24, 2015) (quoting Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008).  The Commissioner has recognized that, when fibromyalgia is established as a medically-determinable impairment, "longitudinal records reflecting ongoing evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence

40

and severity of the impairment . . . .  For a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  Id. (quoting S.S.R. 12-2p, 2012 WL 3104869, at *3).

To the extent that the ALJ declined to afford Dr. Calkins' opinion controlling weight due it being "inconsistent with imaging and testing" and objective examinations show[ing] mostly normal musculoskeletal findings" (T at 24), "discrediting treating source medical opinions and subjective testimony concerning limiting effects of fibromyalgia simply because such evidence is not corroborated by objective medical evidence is error."  Campbell, 2015 WL 73763, at *12 (citing Green- Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)).  Although the ALJ found that plaintiff's fibromyalgia was a severe condition, which implicitly suggests an acknowledgment that objective findings are not needed for a fibromyalgia *diagnosis*, he discredited Dr. Calkins' findings addressing the limiting effects of plaintiff's fibromyalgia for a lack of objective findings.  This Court has held that "discrediting treating source medical opinions and subjective testimony concerning limiting *effects* of fibromyalgia simply because such evidence is not corroborated by objective medical evidence is error."  Id. (emphasis added).  Despite finding plaintiff's fibromyalgia to be a severe impairment, the ALJ's assessment of Dr. Calkins' treatment notes and two MSS "suggests a fundamental misunderstanding of how fibromyalgia generates chronic pain without positive findings."  Id.

A longitudinal assessment of plaintiff's treatment for fibromyalgia supports Dr.

41

Calkins' statements of limitations.[18]  At the time of the hearing, plaintiff had been continually treating with Dr. Calkins since July 2009, and had met with her on several occasions.  See T at 480-505.  On her various visits, plaintiff reported to Dr. Calkins pain averaging a level of six out of ten to eight out of ten.  Id. at 376, 482, 487, 492, 496, 498, 500, 502.  Plaintiff continually tried different methods of pain relief, including pain medication, physical and aqua therapy, injections, use of a TENS unit, and shoulder surgery.  Id. at 496, 500. Records reflect that these methods of pain relief were either not helpful or only temporarily helpful.  Plaintiff reported her pain as constant.  Id. at 485.  She reported that her pain was exacerbated by neck movement (id. at 485), changes in the weather (id. at 498), arm movement (id. at 482), sitting (id. at 494), walking (id. at 498), that "the more she moves, it hurts more," and that "any kind of movement makes the pain worse" (id. at 496, 500).  She reflected that her pain was impacting her mood, ability to work, perform housework, and enjoy life.  Id. at 482.

Although the ALJ correctly observed that Dr. Calkins largely found normal grip strength, range of motion, and gait during exams – conditions that the Commissioner has explicitly expressed are not required characteristics of fibromyalgia – examinations also revealed that Dr. Calkins had observed tenderness in the right and left paraspinous upon examination of the head and neck; swelling joints, limb pain, joint stiffness on March 12, 2010; "exquisitely tender" sacrococcygeal joint which was exacerbated by sitting and "was not overtly mobile."  Id. at 487, 490, 494.

---

[18]  The MSS forms that Dr. Calkins used specifically assessed fibromyalgia, as they asked whether the "patient meet[s] the American College of Rheumatology criteria for fibromyalgia" and for the physician to identify the patient's tender points.  T at 375.  Thus, it appears that the limitations set forth in the two MSS Dr. Calkins provided are specific to plaintiff's fibromyalgia.

Further, the fact that Dr. Calkins may have relied on plaintiff's subjective complaints in reaching her opinion as to plaintiff's limitations "hardly undermines his opinion as to her functional limitations as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'" Green-Younger, 335 F.3d at 107 (citation omitted). Plaintiff's complaints reflect exacerbation of pain with walking or sitting. See T at 494, 498.

Here, upon finding that Dr. Calkins' opinions were unsupported by objective evidence, the ALJ should have recontacted her prior to denying her opinion controlling weight. The ALJ did not explicitly conclude that Dr. Calkins' findings were inconsistent with other record evidence. Cf. Gonzalez v. Chater, No. 96-CV-6250, 1998 WL 398809, at *1 (2d Cir. 1998) (finding that the ALJ did not have to re-contact treating physician where he "did not discredit the opinions of [plaintiff's] treating physicians solely because they were not based on clinical findings but rather gave them 'little weight' on this basis combined with the finding that these treating physicians' opinions were inconsistent with several other medical opinions in the record."). However, even if the ALJ had reached such conclusion, the only other evidence that could be read as "conflicting" with Dr. Calkins assessment is the "internal medicine" consultative examination from Dr. Kalyani Ganesh, who noted only slight limitations in plaintiff's lumbar spine, as plaintiff had flexion of 75 degrees, could not do extension, and lateral flexion and rotation of ten degrees. T at 385. Dr. Ganesh noted sixteen tender points and seven control points. Id. Dr. Ganesh concluded that, upon examination, plaintiff appeared to be in no acute distress, had normal gait, full squat, could walk on heels

43

and toes without difficulty, needed no help getting on/off exam table/chair, and had full grip strength. T. at 384, 386. However, in denying Dr. Calkins' findings controlling weight, instead granting significant weight to Dr. Ganesh, the undersigned repeats that regular grip strength and rotation is consistent with the findings of the treating physicians and not necessarily determinative considering plaintiff's fibromyalgia diagnosis. Green-Younger, 335 F.3d at 108. Thus, as Dr. Ganesh's conclusions are grounded in a lack of objective findings, his RFC is not inconsistent with Dr. Calkins' because it fails to consider plaintiff's fibromyalgia and the well-settled understanding that the condition does not usually present objective physical findings or diagnostic testing.

Because the ALJ declined to afford Dr. Calkins' opinions controlling weight due to his erroneous conclusion that plaintiff's complaints of pain were inconsistent with imaging, testing, and her examinations showing mostly normal musculoskeletal findings – "effectively requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines" – his decision to deny controlling weight to Dr. Calkins' findings is unsupported by substantial evidence.

Thus, because the ALJ was obligated to recontact Dr. Calkins before assigning little weight to her findings, his failure to recontact was error. See Colvegove v. Commissioner of Soc. Sec., 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005); 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").

44

Accordingly, it is recommended that the matter be remanded so that the ALJ may recontact Dr. Calkins or assess the medical evidence with the understanding that fibromyalgia does not always result in objective findings or diagnostic tests.

b. **Dr. Martin**

The ALJ declined to give controlling weight to plaintiff's primary care physician, Dr. Martin, instead affording little weight to her two MSS. The ALJ concluded that Dr. Martins' findings "are not consistent with the negative objective testing (including normal EMG and x-ray studies) and the physician's own treatment notes showing little or no objective findings." T at 24. The ALJ noted that plaintiff treated with Dr. Martin for joint and migraine pain, and that her "treatment notes from 2010 indicate that the claimant presented with normal examination findings." Id. at 19. Addressing Dr. Martins' findings of limitations for plaintiff – specifically identifying a 2012 treatment note indicating that plaintiff reported increasing lower back and tail bone pain, leading her to walk with a cane[19] – the ALJ observed that X-ray imaging of the lumbar spine and sacrum were negative for findings and that there were no positive examination findings. T at 20. The ALJ gave Dr. Martin's assessment of plaintiff's limitations "little weight," stating that Dr. Martins' treatment notes showed little or no objective findings and were inconsistent with negative objective testing. Id. at 24.

Plaintiff contends that the ALJ erred in declining to afford controlling weight to Dr.

---

[19] It appears that the observation that plaintiff relied on a cane was made by Holly Fike, FNP. T at 436.

Martin's opinion. Dkt. No. 10 at 13. She argues the ALJ further erred by improperly failing to consider the Schaal factors in determining to afford Dr. Martins' opinion little weight. Id. at 14. The undersigned agrees that Dr. Martin is a treating physician, as such, she is to be accorded controlling weight unless her findings are unsupported by medically-acceptable clinical and laboratory diagnostic techniques and in conflict with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2).

The undersigned agrees with the ALJ's assessment that Dr. Martins' treatment records reveal few objective findings. Dr. Martins' treatment notes largely contain referrals for various diagnostic testing or are merely reflective of plaintiff's chief complaints during her visit without a medical conclusion or opinion as to those conditions. The undersigned observes that plaintiff treated with Dr. Martin for various ailments, including allergies (T at 339); tail bone pain (id. at 436); shortness of breath, dry cough, "back pain on left side when breathing" (id. at 459); "reevaluation" of Bipolar disorder, fibromyalgia, and body aches (id. at 341); fatigue (id. at 341); chest tightness (id. at 457); medicine side effects (id. at 465); a request for a nicotine patch and to discuss "being taken out of work" (id. at 467); sore throat/sinus infection (id. at 469); migraines (id. at 471); re-evaluation of migraines (id. at 470); weight loss (id. at 432); and urinary tract infection (id. at 469). However, the notes do not contain any findings nor are they reflective of any limitations. Although Dr. Martin ordered a variety of X-ray testing, including of the chest and abdomen, an MRI of the brain, and a bone mineral density test, all results came back unremarkable. Id. at 452, 463, 473-75.

As noted, plaintiff has been diagnosed with fibromyalgia, a condition that

46

necessarily does not result in objective findings. Thus, it would be improper if the ALJ rejected Dr. Martins' opinions due to lack of objective findings regarding that disorder. However, although Dr. Martins' treatment notes and MSS list plaintiff's fibromyalgia as a diagnosed condition, Dr. Martins' treatment records did not even reflect frequent complaints of fibromyalgia pain nor do they connect plaintiff's complaints with her fibromyalgia. There is only one treatment note wherein Dr. Martins addresses fibromyalgia – on March 11, 2011, "re-evaluated" plaintiff's fibromyalgia. Id. at 341. The treatment records contained no findings relating to this condition. See id. Thus, it is unclear whether Dr. Martins based her statements of limitation on plaintiff's fibromyalgia or whether she was relying on a different condition, such as plaintiff's degenerative disc disease or neck pain.

In her earlier MSS, as noted, Dr. Martin limited plaintiff to walking one half of a block without pain; sitting for thirty minutes at one time; standing for one hour at one time, sitting, standing, or walking for a total of four hours in a work day; shift when needed; taking five minute breaks every fifteen minutes; lift up to ten pounds occasionally; occasionally look down or turn head; occasionally twisting, stooping, bending, crouching, or climbing ladders and stairs; and that plaintiff would be off task more than 20% of the work day and absent more than four days per month. T at 374. The second MSS offered a fair prognosis and limited plaintiff to walking one to two city blocks; that plaintiff could sit for at least six hours; stand or walk for two hours; take hourly five to ten minute breaks; shift positions at will; frequently lift less than ten pounds and occasionally lift ten pounds; and occasionally look up/down, turn her head

47

left right, or hold her head static.  Id. at 513.  The remaining limitations were the same as set forth in the earlier MSS.  See id. at 374, 513-14.

Although Dr. Martins treated plaintiff for several conditions over many visits, and it appears that Dr. Martins may have treated plaintiff for her fibromyalgia pain at some point, the undersigned cannot locate within the doctor's records the source of these opined limitations.  A treating physician is entitled to controlling weight only when her opinion is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Halloran, 362 F.3d at 32.  As discussed, plaintiff suffers from fibromyalgia, a condition that the ALJ does not dispute, and one that is not often associated with objective diagnostic or imaging results.  In rejecting Dr. Martins' MSS on the basis that the opined limitations conflicted with negative objective testing, the ALJ declined to recognize that fibromyalgia often does not have objective results.  Because the ALJ rejected Dr. Martins' opinion upon finding that her conclusions as to plaintiff's limitations were unsupported by objective evidence, the ALJ was required to recontact physician.

Accordingly, it is recommended that the matter be remanded to the ALJ for consideration of whether Dr. Martins' limitations were based on plaintiff's fibromyalgia, a different condition, or a combination of conditions, and whether the record evidence supports such limitations when it is considered that fibromyalgia may not result in positive objective findings.  Should the ALJ find that it is unclear upon what basis the doctor found these limitations, the ALJ should recontact the physician.  See Chase v. Astrue, 11-CV-12 (RRM), 2012 WL 2501028, at *11 n.4 (E.D.N.Y. June 28, 2012)

48

(finding that an ALJ may not reject a treating physician's opinions "solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings" and holding that the ALJ must recontact the physician before disregarding the physician's assessment).

### c. **Dr. Shukri**

The ALJ gave Dr. Shukri's opinions as to plaintiff's physical limitations little weight, finding his MSS to be "contrary to the objective examinations and diagnostic evidence." T at 24. The ALJ found that "Dr. Shukri's own treatment records do not support" Dr. Shukri's MSS "that contains limitations preventing work." Id. The ALJ noted that Dr. Shukri "observed that the claimant presented with normal status examination findings, including the ability to give a 'well-organized medical history'"; that plaintiff's neurological exam was normal; plaintiff walked with a normal gait and had no difficulty with toe, heel, or tandum walking; had full strength in all extremities, but did have some tenderness and decreased range of motion in her neck. Id. at 19. He also referenced Dr. Shukri's report that plaintiff's headaches had decreased in frequency while taking Treximet, Topamax, and Zanaflex. Id. The ALJ noted that Dr. Shurki's records reported that plaintiff displayed delayed cognition and decreased motor movement in September 2011, and that in December 2011, plaintiff reported daily headaches, despite medication. Id. at 20. However, the ALJ pointed out that plaintiff reported nearly two months of headache relief from her Botox treatments. Id. The ALJ

noted that the September 2011 exam was the only post-onset date exam wherein Dr. Shukri reported abnormal findings. Id. at 24.

Dr. Shukri treated plaintiff for cervicogenic headaches and migraine headaches beginning in November 2010. T at 562, 565-66. Similarly, in his MSS, Dr. Shukri listed plaintiff's impairments as chronic migraine headaches and cervicalgia, which means "neck pain."[20] Id. at 518. Although it appears to the undersigned that Dr. Shukri largely treated plaintiff for migraines, the ALJ noted that he declined to afford controlling weight to Dr. Shukri's opinions in part because "objective examination revealed only few abnormalities such as limited cervical range of motion and some tenderness in the upper cervical area and occipital notch." Id. at 24. Indeed, after noting Dr. Shukri's physical findings of limited cervical tenderness and decreased arm swing, slow gait, and otherwise normal physical testing, the ALJ contrasted those findings with Dr. Shukri's August 2, 2012 exam wherein he states plaintiff was still doing "fairly well." T at 24. However, the comment that plaintiff was doing "fairly well" was regarding plaintiff's response to Botox treatments for her migraines, not due to any physical limitations. Id. at 570.

Here, the ALJ determined that plaintiff's migraines were a severe impairment; however, in declining to afford controlling weight to Dr. Shukri's opinions in part because of normal musculoskeletal findings, it appears that the ALJ determined that musculoskeletal limitations findings were a necessary correlation in order to

---

[20] "Cervicalgia is a general term that describes neck pain." Munoz v. Colvin, 13-CV-1269 (VSB/HBP), 2014 WL 4449788, at *2 n.4 (S.D.N.Y. Sept. 10, 2014).

demonstrate plaintiff's migraine pain. However, there is no medical opinion in the record providing that migraines can or must be established through anatomical or physiological abnormalities that can be objectively observed and reported apart from a claimant's subjective reports. Indeed, there is no opinion in the record from a qualified medical expert to hold that plaintiff's migraines would be inconsistent with limited objective physical findings such as intact motor strength or normal gait. See Chase, 2012 WL 2501028, at *11 n.4 (finding that, where there was no medical evidence or opinion in the record suggesting that any of the plaintiff's conditions would be inconsistent the lack of objective medical findings – such as intact motor strength of the extremities, lack of atrophy or sensory deficits, and acceptable muscle tone – the ALJ could not conclude that the plaintiff's complaints of pain were inconsistent with medical evidence). Neither the SSA nor the courts in this Circuit have required that an impairment, including migraines, be proven through objective clinical findings. Indeed, this Court has previously recognized that "there exists no objective clinical test which can corroborate the existence of migraines." Groff v. Commissioner of Soc. Sec., 2008 WL 4104689, at *6-*8 (N.D.N.Y. Sept. 3, 2008) (observing that, in indicating that there was a lack of objective findings as to the plaintiff's migraine headaches and decling to recognize migraines as a severe impairment, the ALJ "evince[d] an erroneous understanding of the nature of migraine headache and the treatment of such condition" and recognizing the "potential elusiveness of this impairment.").

Further, there is no other medical evidence in the record that is inconsistent with Dr. Shukri's opined limitations caused by plaintiff's migraines. To the extent that the

51

ALJ relied on the opinion of Dr. Ganesh – the only medical opinion conflicting with the physical limitations set forth by Dr. Shukri – Dr. Ganesh reached his findings as to plaintiff's limitations based on her X-ray imaging showing only degenerative changes and her full range of motion in all extremities, except the lumbar spine; normal gait; full squat; normal grip strength; and an ability to perform heel/toe walk. Dr. Ganesh did not address plaintiff's migraines or address whether physical findings or imaging studies were required to demonstrate the existence or severity of migraine pain.

As the ALJ appeared to base his determination to accord less than controlling weight, and, in fact, little weight to Dr. Shukri's findings based at least in part due to a lack of significant physical/musculoskeletal findings, the undersigned concludes that his determination is not based on substantial evidence. Thus, prior to rejecting Dr. Shukri's opinion as being unsupported by objective medical evidence, the ALJ should have recontacted Dr. Shukri, a specialist and plaintiff's treating physician, to obtain his opinion as to the origin of plaintiff's migraines in order to make an informed determination whether musculoskeletal findings, normal gait, normal grip strength, and normal range of motion, were necessary to demonstrate the severity of plaintiff's migraines or cervicalgia. See, e.g., Taylor v. Astrue, No. CV-07-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding it error for the ALJ to not re-contact Plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence").

Accordingly, it is recommended that the matter be remanded so that the ALJ may recontact Dr. Shukri to ascertain whether it was his opinion that plaintiff's

migraines had a physician origin and for reconsideration of the proper weight to be accorded to Dr. Shukri. To the extent that the ALJ still finds that Dr. Shukri is not entitled to controlling weight, he must provide reasons that are supported by substantial evidence in the record.

### d. **Dr. Iqbal**

Addressing Dr. Iqbal's records, the ALJ observed that plaintiff reported to Dr. Iqbal for worsening depression and bipolar symptoms in March 2010. T at 21. Plaintiff reported to Dr. Iqbal a ten percent improvement with medications and experiencing up and down periods. Id. The ALJ observed that Dr. Iqbal's records "were normal except for sad mood and affect." Id. The ALJ further noted that plaintiff reported one hundred percent improvement by June 2010 after treating with Klonopin and Ambien. Plaintiff's mood was happy and she had appropriate affect. Id. In February 2011, Dr. Iqbal noted slowed speech and decreased energy. Id. The ALJ afforded Dr. Iqbal's opinion little weight, noting that Dr. Iqbal "last saw the claimant on March 1, 2011, which is one day prior to the alleged onset date and eighteen months prior to the medical source statement." Id. at 25. Further, the ALJ concluded that Dr. Iqbal's records "show mostly normal mental status findings . . . For example, on March 1, 2011, the mental status examination only noted anxious mood while also noting appropriate status in all other categories including excellent insight." Id.

Insofar as the ALJ gave little weight to Dr. Iqbal's opinion because his last day of treatment occurred the day before plaintiff's alleged onset date, this does not render

evidence from Dr. Iqbal irrelevant, per se. There is nothing in the record to indicate that plaintiff's limitations materially worsened or improved between March 1, 2011, Dr. Iqbal's last date of treatment, and March 2, 2011, the onset date. The nature of the treating relationship is just one factor the ALJ must consider when determining the weight to apply to a treating physician's opinion. See generally Kirkham v. Commissioner of Soc. Sec., 2015 WL 3504889, at *5 (N.D.N.Y. June 3, 2015). Regardless, even if the ALJ's notation was erroneous, it does not amount to reversible error, as the ALJ did not appear to rely solely on this finding in affording Dr. Iqbal's opinion little weight.

Dr. Iqbal's medical notes reflect that plaintiff experienced up and downs, feeling good for a period of days, then feeling down. T at 544. Dr. Iqbal s treatment records provide support for this conclusion. In April 2010, plaintiff reported a seventy-five percent improvement in overall symptoms. Id. at 547. However, by May 4, 2010, plaintiff had no improvement since the last visit, still felt depressed, and had difficulty sleeping throughout the night. Id. at 548. Plaintiff "admit[ted] to mind racing and highs and lows." Id. By June 10, 2010, plaintiff reported a "100% improvement." Id. at 549. However, by the end of the month, June 29, 2010, after decreasing her dose of Cymbalta, plaintiff reported feeling down, having mood swings, crying a lot, and having decreased energy. Id. at 550. By July 19, 2010, plaintiff reported feeling a little better, but reported that she missed three days of work in last four to five weeks because of depression. Id. at 551. In September 2010, plaintiff reported that she was "doing well" on her medication and was sleeping well on her medications. Id. at 552.

On January 11, 2011, plaintiff reported feeling down and sad, having decreased motivation, racing thoughts, mood swings, feeling irritable, sleeping more, "high panic attack," and that she did not feel comfortable in crowded places. Id. at 554. On February 1, 2011, plaintiff presented as "anxious" in mood and affect, but denied racing thoughts and mood swings. Id. at 55. On February 14, 2011, which was reported as an "emergency" visit, plaintiff presented with slurred speech and was feeling dizzy. Id. at 556. On March 1, 2011, plaintiff reported having increased symptoms at work and that she did not feel comfortable at work; however, Dr. Iqbal noted that plaintiff looked "better than last time, affect much better." Id. at 557.

The ALJ declined to afford Dr. Iqbal's opinion controlling weight in part because of the "mostly normal mental status examination findings." T at 25. Indeed, the record reflects that, although Dr. Ibqal found excellent insight and judgment in several of his examinations, several of Dr. Iqbal's examinations also reflected symptoms that the ALJ did not address, such as mood swings, missing work, anxiety in crowded places, and difficulty sleeping. To the extent that the ALJ declined to afford Dr. Iqbal controlling weight because of "normal" examination findings, the undersigned does not find support for this conclusion in the record due to the various symptoms Dr. Iqbal identified during his treatment of plaintiff. Here, it appears that the ALJ cherry-picked the portions of Dr. Iqbal's treatment records that supported the ALJ's determination that plaintiff is not disabled by her bipolar disorder and disreagarded the portions of the opinion that support Dr. Iqbal's opinion that plaintiff's Bipolar disorder imposed significant limitations on plaintiff's ability to perform basic work activities. See generally Vazques v.

55

Commissioner of Soc. Sec., 14-CV-6900 (JCF), 2015 WL 4562978, at *16 n.30 (noting that an ALJ may not simply rely on portions of a treating physician's opinion that support his conclusion as to disability and then disregard portions that support a finding otherwise).

Accordingly, it is recommended that the matter be remanded for reassessment of the remaining findings recognized by Dr. Iqbal in his treatment records. To the extent that the ALJ determines that Dr. Iqbal's findings are still not to be afforded controlling weight, the ALJ must set forth, in detail, his reasons for why all of the symptoms identified by Dr. Iqbal in his treatment records are not indicative of the limitations opined by the physician, and must review the factors set forth in 20 C.F.R. § 404.1527(c)(2).

### e. **Dr. Mohabir**

The ALJ afforded Dr. Mohabir's opinion little weight. T at 24-25. The ALJ observed that plaintiff began treating with Dr. Mohabir on March 22, 2011, after plaintiff indicated that her previous psychiatrist "does not listen to her." T at 21. The ALJ noted that plaintiff reported worsening depression symptoms. Id. The ALJ noted that Dr. Mohabir's records indicated little initial improvement in plaintiff's symptoms, but that by July 2011, plaintiff reported seventy percent improvement. Id. at 22. The ALJ noted that Dr. Mohabir's conclusion that plaintiff could not function in a work setting and had difficulty performing daily activities is "inconsistent with Dr. Mohabir's opinion elsewhere in the document that the claimant had no limitations in social interaction, adaption, sustained concentration and persistence, and understanding/memory." Id. at 24. The

ALJ concluded that Dr. Mohabir's finding that plaintiff was seriously limited and unable to maintain attention, regular attendance, work in close proximity to others, and complete a normal work week was inconsistent with treatment records showing that plaintiff was improving.  Id.  The ALJ points out that an August 2011 treatment record noted a sixty percent improvement; that in September 2011, plaintiff "received in-patient treatment[21] for a week after being stressed about the cessation of her short term disability payments . . . [n]evertheless, on November 3, 2011, '50-60%' improvement was noted."  Id.  The ALJ noted that in Dr. Mohabir's records from February and May 2012, plaintiff reported feeling very depressed, but in July 2012, plaintiff was "OK."  Id.  Thus, the ALJ concluded that Dr. Mohabir's "treatment records do not show a consistent 12 months or more of completely disabling mental impairments as opined by Dr. Mohabir."  Id.  Further, the ALJ noted that "from the treatment records, it appears that Dr. Mohabir only performed medication management and did not conduct any mental status examinations."  Id.  The ALJ further noted that two of the contacts were by telephone.  Id.

The undersigned will first address the plaintiff's argument that the ALJ improperly lessened the weight he accorded to Dr. Mohabir because two of the treatments occurred over telephone.  The limited nature of a treating source's involvement with a claimant's care is a valid reason for assigning lesser weight to his opinion.  See 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and

---

[21]  The in-patient treatment the ALJ referenced here is plaintiff's one-week hospitalization after her suicide attempt.  T at 422.

57

the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); 20 C.F.R. § 416.902 (treating source is one with whom claimant has "ongoing treatment relationship").  Thus, an ALJ may consider whether treatment was performed over the telephone; however, the undersigned does note that only two of the approximately seventeen treatments were rendered over the telephone.  Thus, the nature of treatment was largely in person and these two phone call appointments should have little, if any, impact on the weight afforded to Dr. Mohabir.  It is unclear how heavily the ALJ relied on the two telephone appointments in assigning her opinion little weight.

The undersigned will next address the ALJ's first reason for declining to afford Dr. Mohabir's opinion controlling weight – that Dr. Mohabir's finding that "plaintiff could not function in a work setting and had difficulty performing daily activities" is "inconsistent with Dr. Mohabir's opinion elsewhere in the document that the claimant had no limitations in social interaction, adaption, sustained concentration and persistence, and understanding/memory."  Id. at 24.  Finding that an individual is unable to function in a work setting can properly be based on other limitations and is not necessarily inconsistent with a finding that the individual has no limitations on social interaction, adaption, sustained concentration and persistence, and understanding and memory.  The undersigned observes that a claimant who has no limitations in basic work activties such as social interaction, adaption, concentration, persistence, understanding, and memory can still be precluded from employment due to limitations in other areas essential to functioning in a work setting.  For example, Dr. Mohabir

58

opined that plaintiff was unable to deal with normal work stresses or regularly maintain attendance.

The ALJ concluded that Dr. Mohabir's finding that plaintiff was seriously limited and unable to maintain attention, regular attendance, work in close proximity to others, and complete a normal work week was inconsistent with treatment records showing that plaintiff was improving. Id. Although the ALJ properly recognizes that plaintiff demonstrated improvement over the course of treatment with Dr. Mohabir, the undersigned observes that the improvement was varied. On October 6, 2011, plaintiff was "doing better since hospitalization, but starting to feel depressed again." 510. By November 3, 2011, plaintiff's depression was improved by fifty to sixty percent. Id. On December 12, 2011, plaintiff reported having one to two days a week of feeling down. Id. On this date, Dr. Mohabir noted that this was plaintiff's "best functioning since I've been seeing her." Id. at 510. By February 1, 2012, plaintiff was "still very depressed" and could not tolerate her Topamax. Id. at 511. In May 7, 2012, plaintiff was "feeling very depressed again" and experiencing "passive S.I./No plans to try to hurt self." Id. On July 24, 2012, Dr. Mohabir reported that plaintiff was "doing OK." Id.[22] Thus, improvements in depression that are later followed by a worsening state are not inconsistent with findings that plaintiff was seriously limited and unable to meet competitive standards in maintaining attention, regular attendance, working in proximity to others without distracting them/displaying behavioral extremes, or completing a work

---

[22] On April 26, 2011, in response to a note that plaintiff inquired about SSI - permanent disability, Dr. Mohabir wrote: "I don't think pt. is disabled. She is unable to work at this time, but should be able to work in the future." T at 507. An ALJ need not give weight to a conclusion that is left to the commissioner. (Snell, 117 F.3d at 133).

week without interruptions from psychologically-based symptoms.  See id. at 24.

The Court cannot engage in a re-weighing of the evidence; however, the undersigned

does conclude that the portions of Dr. Mohabir's findings pointed out by the ALJ as

internally inconsistent are not necessarily inconsistent.

Regardless, in declining to afford controlling weight to Dr. Mohabir's opinion,

because the ALJ found her treatment notes and opinions to contain inconsistencies, the

ALJ had an affirmative duty to further develop the record in light of the non-adversarial

nature of a disability hearing.  See Lamay v. Commissioner of Soc. Sec., 562 F.3d 503,

508-09 (2d Cir. 2009).  Where a treating physician's opinion is "out of sync with the

treating notes, the ALJ [does] not have the luxury of terminating his inquiry at that stage

in the analysis."  Hidalgo v. Colvin, No. 12-CV-9009, 2014 WL 2884018, at *19

(S.D.N.Y. June 25, 2014).

Accordingly, it is recommended that the matter be remanded to the ALJ so that

he may re-contact Dr. Mohabir to address any inconsistencies that he believes to exist

in the record or in either of her MSS.  To the extent that, after contacting the doctor, the

ALJ wishes to afford her opinion anything less than controlling weight, he must state his

reasoning with sufficient detail for the Court to understand his reasoning.


## 2.  **Credibility**

The Court reviews an ALJ's findings of fact under a substantial evidence

standard.  "It is the function of the Commissioner, not the reviewing courts, to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Aponte v. Sec 'y, Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir.1984) (citation and internal punctuation omitted).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of evidence in the record.  20 C.F.R. § 404.1529; Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); see SSR 96-7p, 1996 WL 374186, at *5 (S.S.A. July 2, 1996).  First, the ALJ must assess whether there is a medically-determinable impairment that could reasonably be expected to cause the alleged symptoms.  SSR 96-7p, 1996 WL 374186, at *2. Where no impairment is found that could reasonably be expected to produce the complained-of pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities.  Id.

When the evidence demonstrates the existence of a medically-determinable impairment, the second step of the analysis requires the ALJ to "'consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with other objective medical evidence and other evidence.'"  Genier, 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(a)).  "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."  Casino-Ortiz v. Astrue, 06-CV-155 (DAB/JCF), 2007 WL 2745704, at *11, n.21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)).

Where an ALJ determines that a claimant has a medically-determinable impairment, but the claimant's complaints of pain are unsupported by objective medical evidence, the ALJ must then consider several factors pursuant to 20 C.F.R. §§

404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;

> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

> (iii) Precipitating and aggravating factors;

> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).  An ALJ's failure to explicitly address each of the credibility factors in the decision does not warrant a remand where the bases for the ALJ's decision can be gleaned from the record.  See Cichocki v. Astrue, 534 F. App'x. 71, 76 (2d Cir. 2013) (Summary Order).

However, "disability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept, "difficult to prove, yet equally difficult to disprove[,]" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Id.  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." Snell, 177 F.3d at 135 (citing Donato, 721 F.2d at 418-19).  Thus, the ALJ may reject

62

the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v, 728 F.2d at 591 (2d Cir. 1984).  A claimant's credibility determination "must include the entire case record, objective medical evidence, the individual's owns statements about symptoms, statements provided by treating or examining physicians or psychologists, and other persons about the symptoms and how the effect the claimant, and any other relevant evidence in the case record." Arrington v. Astrue, No. 09-CV-870, 2011 WL 3844172, at *13 (W.D.N.Y. Aug. 8, 2011) (citing SSR 96-7p, 1996 WL 374186, at *4).  That the ALJ "has the benefit of directly observing a claimant's demeanor and other indica of credibility . . . entitles the ALJ's credibility assessment to deference."  Schlichting v. Astrue, 11 F. Supp. 3d 190 (N.D.N.Y. 2012) (quoting Tejada v. Apfel, 167 F.3d 770, 770 (2d Cir. 1999)).

Here, the ALJ indicated that plaintiff's medically-determined impairments could reasonably be expected to cause such symptoms, but that her complaints of pain and limitations are "not entirely credible for the reasons explained in this decision."  T at 19. The ALJ noted that: "[o]bjective imaging showed no findings other than degenerative changes," physical therapy and pain management records "indicate that treatments were successful in alleviating the claimant's symptoms to a degree," neurology records indicated that plaintiff's "migraine pain was controlled using injections and medications," orthopedic records show that plaintiff's "shoulder pain and accompanying symptoms were resolved after surgery, contrary to her reports of limited manipulative abilities," multiple normal exam findings from physicians are "inconsistent with the claimant's description of her limitations," mental health records show that plaintiff was

63

"noncompliant in her attendance of psychiatric and therapy appointments," "[m]ost of the reports of 'cycling' were based solely on the claimant's own subjective reports," plaintiff "admitted that the psychiatric admission in September 2011 resulted from stress over the ending of short-term disability benefits," and "[f]urther diminishing the claimant's credibility is reports of drug-seeking behavior and her statements that she has returned to work on a part-time basis." T at 25. Further, the ALJ acknowledged that "[e]xaminers noted findings including diminished range of motion and tenderness in the neck as well as 16 of the 18 classical fibromyalgia trigger points. Despite these findings, examiners noted that the claimant demonstrated full strength and range of motion in her extremities and normal gait." Id. at 19. The ALJ continued that there was "no evidence of motor or sensory deficits." Id. Further, the ALJ noted that EMG studies from August 2009 and November 2010 "were negative for radioculopathy or neuropathy" and that "[t]reatment personnel noted that magnetic resonance imaging (MRI) of the spine was negative for findings." Id. Further, he noted that plaintiff underwent nerve block treatments, trigger point injections, physical therapy, and took Cymbalta, Ultram, and Lyrica for pain management, and that plaintiff "reported that the treatments provided some relief." Id.

Plaintiff argues that the ALJ's credibility determination was legally flawed and not supported by substantial evidence. However, the ALJ's credibility can only be properly assessed after the correct application of the treating physician rule. In reaching his disability determination, the ALJ must consider all of the claimant's symptoms, including her subjective complaints of pain, and "the extent to which [the] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a).  Opinions of a claimant's treating physicians are a significant part of the evidence that the ALJ must weigh in determining the claimant's credibility under 20 C.F.R. § 404.1529.  Thus, on remand the ALJ must reassess the plaintiff's credibility after performing a reassessment of the treating physicians in the record.

Although remand is necessary for reassessment of plaintiff's credibility following reapplication of the treating physician's rule, the undersigned determines that certain of the ALJ's credibility findings can be addressed at the outset.

### a. Drug-Seeking Behavior

The ALJ referenced "reports of drug-seeking behavior" in making his credibility assessment.  T at 25.  The ALJ does not provide a citation to the record wherein the alleged behavior is noted.  Id.  Plaintiff contends that the ALJ is erroneously interpreting her suicide attempt via hydrocodone and Klonopin overdose as drug-seeking behavior. Dkt. No. 10 at 26.  Defendant contends that the ALJ is referencing page 487 in the transcript, a May 10, 2012 treatment record from Dr. Calkins indicating that "[p]atient given script for percocent only MDD[23] of 3 and she was counselled [sic] that she will get no more, and if she violates the policy again we will discontinue use."  Dkt. No. 13 at 14.  At the hearing, plaintiff explained that this treatment note was a mix-up because

---

[23] Based on Dr. Calkins' later treatment notes, it appear MDD stands for maximum daily dose. See T. at 489.

65

she had told Dr. Calkins that she was also taking pain medication given to her by her dentist after she had a tooth pulled. T at 59. Although the medical records from that appointment provide that "[b]y report there is poor compliance with plan of care," it is unclear from this record alone what the "violation" referred to. T at 485. March 12, 2012 and July 9, 2012 treatment notes – which appear to be the last appointments before and after the appointment indicating a "violation" – indicate "[b]y report there is good compliance with plan of care." Id. at 482, 486. Further, the undersigned could find no other evidence in the record of plaintiff misusing her prescribed narcotics or otherwise exhibiting drug-seeking behavior.

To the extent that the ALJ wished to diminish plaintiff's credibility due to this one treatment record, in light of the ALJ's duty to develop the record, he was required to contact Dr. Calkins for an explanation of this notation. Without an explanation of this vague note from Dr. Calkins, especially when one considers plaintiff's explanation for this note, there is no evidence of drug-seeking behavior. To the extent that the ALJ relied on this finding in assessing plaintiff's credibility, such a finding is improper and not supported by substantial evidence.

Accordingly, it is recommended that the matter be remanded and that, on remand, the ALJ either obtain clarification of this alleged drug-policy violation from Dr. Calkins or disregard this vague statement in making his credibility assessment.

b. **Noncompliance with Treatment**

Insofar as the ALJ concluded that plaintiff's credibility was diminished by her

failure to attend several therapy appointments (T at 21), "[c]ourts have observed that faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a questionable practice." Cornell v. Astrue, 11-CV-1064 (GTS), 2013 WL 286279, at *8 (N.D.N.Y. Jan. 24, 2013).   Before relying on plaintiff's frequent cancellations, re-scheduling, and failures to appear at her therapy appointments, the ALJ should have considered whether there was a justifiable reason for her absenteeism.  See Roat v. Barnhart, 717 F. Supp. 2d 241, 266 (N.D.N.Y. 2010) (citing SSR 82-59, 1982 WL 31334 (S.S.R. 1982); Reals v. Astrue, 08-CV-3063, 2010 WL 654337, at *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from . . . poor insight . . . predispo[sing] the individual to noncompliance with treatment . . .").   Here, there is no indication that the ALJ considered plaintiff's migraine headaches or her Bipolar disorder or depression as a reason for plaintiff's missing appointments; however, there is an indication in the record that, at least for some of the appointments, plaintiff cancelled due to "illness" or migraines.  Cf. Kelly v. Barnhart, 07-CV-6302, 2008 WL 850341, at *9 (W.D.N.Y. Mar. 28, 2008) (finding that the ALJ may properly consider noncompliance in making credibility determination because the plaintiff's noncompliance with treatment was due to his illicit drug use and not his mental impairments).  The Court observes that, out of approximately fifty appointments with therapist Janice Scaturo, LCSW., plaintiff had approximately twenty cancellations or failures to appear.  T at 363-64, 538-43.

However, it is also notable that, on several of those cancellations,[24] plaintiff reported feeling ill (id. at 364, 539, 542, 543), having a migraine or headache (id. at 364, 539), oversleeping (id. at 364), or she was psychiatrically hospitalized (id. at 539).  A few cancellations were due to plaintiff's children being ill or because of childcare issues. Id. at 540-42.  There is no reason provided for five no show appointments.  T at 538-43. Further, cancellations with therapist Antoneta Chairmonte from Psychological Health Care indicate that she cancelled on two occasions because her mother was in the hospital or plaintiff herself was ill. T at 359-60.[25]  An ALJ is permitted to consider a plaintiff's noncompliance with treatment in weighing the plaintiff's credibility.  However, here, there is an indication that plaintiff's mental health impairments had at least some impact on plaintiff's missing appointments.  The ALJ did not assess whether this noncompliance could possibly have been caused by plaintiff's mental conditions.  T at 25.

In making his RFC assessment, the ALJ noted "[t]he claimant herself admitted that the psychiatric admission in September 2011 resulted from stress over the ending of short-term disability benefits."  T at 25.  The undersigned is unsure of the meaning behind this comment.  It is unclear whether the ALJ is attempting to conclude that plaintiff's week-long hospitalization for a suicide attempt was merely stress-induced,

---

[24]  The undersigned observes that on several occasions, Ms. Scaturo did not list the reason for plaintiff's cancellation.  See T. at 539-43.

[25]  After attending two sessions ,in June 2011, plaintiff terminated her treatment at Psychological Health Care without a reason given.  T at 361.  Although somewhat difficult to read, treatment notes with Ms. Scaturo recounting plaintiff's therapy history include that plaintiff stated that "Antonette didn't click," suggesting that plaintiff may have been referring to her prior therapist, Antoneta Chairmonte.  Id. at 363.

rather than caused by a medically-determinable impairment or perhaps if the ALJ is intimating that the suicide attempt was a ploy to keep her disability. Accordingly, it is recommended that the matter be remanded, and that, on remand, the ALJ assess whether plaintiff's mental health or physical conditions played a role in plaintiff's missing certain therapy appointments. It is further recommended that, insofar as the ALJ may be suggesting that plaintiff's suicide attempt was motivated by something other than mental health impairments, that the ALJ clearly set forth his reasoning and his support for this conclusion.

### 3. **Step Five**

At step five of the sequential evaluation, the ALJ must determine whether there is work in the national economy that the claimant is capable of performing. 20 C.F.R. §§ 404.1566, 416.966. At step five, the burden shifts to the Commissioner to either award benefits or show, after considering claimants' ages, education, work experiences, and residual functional capacity, that jobs exist in significant numbers in the national economy that claimants can perform. See 20 C.F.R. §§ 404.1560(c), 416.960(c); see also Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

As the undersigned finds that remand is necessary for the ALJ to reconsider the weight afforded to the treating physicians, review of the ALJ's step five findings is premature, as it may be affected by the ALJ's reassessment of the physicians' opinions and plaintiff's credibility.

Accordingly, it is recommended that, on remand, following reconsideration of the

weight afforded to the treating physicians and assessment of plaintiff's credibility, should the ALJ reach any different findings and should the ALJ reach step five of the sequential evaluation, he is to contact a vocational expert to present appropriate hypotheticals to assess whether there are jobs in the national economy that plaintiff could perform.

## III.  Conclusion

 **WHEREFORE**,

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **REMANDED,** pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this decision; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

Dated: September 8, 2015
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge